

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1111-10

### JAMES MELTON FRAZIER, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

**KELLER, P.J., filed a dissenting opinion.**

We granted review in this case to consider whether a co-owner of property may be convicted of criminal trespass for remaining on that property after another co-owner tells him to leave. Because the evidence does not establish beyond a reasonable doubt that appellant was on the property of "another," or that he lacked effective consent to be on the property, I would render a judgment of acquittal.

A person is guilty of criminal trespass if he "enters or remains on or in property of another, including residential land . . . without effective consent [and]: (1) has notice that the entry was

forbidden; or (2) received notice to depart but failed to do so."[1] The term "another" means "a person other than the actor."[2] The trespass statute therefore proscribes the conduct of entering or remaining on "the property of a person other than the actor." Although the Penal Code defines "owner" as a person who "has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor,"[3] the trespass statute makes no reference to ownership, and we have held that ownership is not an element of criminal trespass.[4] Ownership might nevertheless be alleged in a charging instrument in order to describe in what way the property is that of "another."[5]

But what happens if two people are title owners to a parcel of land and each tells the other to depart, with each refusing depart? Are both guilty of criminal trespass? On the other hand, if a person who has no right to possession of or interest in the land were to fence it in and occupy it, would the rightful owner commit a trespass by entering the property without the usurper's permission, because "owner" includes "one who has possession of the property, whether lawful or not?" In *Boykin v. State*, we explained that we give effect to the plain meaning of statutory language unless the language is ambiguous or the plain meaning leads to absurd results that the legislature

---

[1] TEX. PENAL CODE § 30.05(a).

[2] *Id.*, § 1.07(a)(5).

[3] *Id.*, § 1.07(a)(35).

[4] *Langston v. State*, 855 S.W.2d 718, 721 (Tex. Crim. App. 1993).

[5] *State v. Kinsey*, 861 S.W.2d 383, 384-85 (Tex. Crim. App. 1993).

could not possibly have intended.[6]  I do not believe the plain meaning would make both owners guilty in the first hypothetical, or the rightful owner guilty in the second, but if it did, those would be absurd results.  In conducting a plain meaning analysis, we read the statutory language in context and construe the words according to the rules of grammar and common usage.[7]  The word "another" is used in conjunction with the phrase "without effective consent."  So a person commits trespass by being on the property of "another" only if he lacks effective consent from someone who has the authority to give it.

In *Kinsey*, we specifically reserved the question of whether a defendant can trespass on property to which he has lesser title than the complainant.[8]  In so saying, we seem to have implied that a trespass would not occur if the defendant had equal or greater title than the complainant.  I am unaware of any cases construing the current trespass statute as it applies to property with multiple owners, but some very old cases have addressed the issue of trespass with respect to multiple owners in various contexts.  In *Davidson v. Wallingford*, the Texas Supreme Court stated that, in order to evict a defendant from a parcel of land, a plaintiff who was a tenant in common (that is, one of multiple owners) must show not only his ownership interest, "but also that the defendant has no title to any interest."[9]  In *McCuen v. State*, we held that a defendant could not be convicted of unlawfully

---

[6]  818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[7]  *Tapps v. State*, 294 S.W.3d 175, 177 (Tex. Crim. App. 2010) (citing TEX. GOV'T. CODE § 311.011(a)).

[8]  861 S.W.2d at 385 (emphasis added, bracketed material substituted for original to change plural terms to singular).

[9]  88 Tex. 619, 625, 32 S.W. 1030, 1033 (1895).

breaking a fence when the fence was on property owned in common between himself and the complainant.[10] On the other hand, our predecessor, the Court of Appeals, held in *Zallner v. State* that a landlord can be liable for trespass on property that he has leased to a tenant because the landlord has no right of entry without the tenant's permission unless such right had been specially reserved.[11]

From a review these cases and the current trespass statute, I conclude that owners who have an equal interest in the property cannot be criminally liable for trespass unless one of the owners has been given the exclusive right to possess the property, by agreement or otherwise,[12] and a different owner has infringed on that exclusive right. In other words, all owners of equal status have the ability to effectively consent to their own entry onto the property unless, by agreement or otherwise, the right of entry has been vested exclusively in only one or some of the owners. I turn now to whether the evidence in the present case is sufficient to support appellant's conviction.

Under *Jackson v. Virginia*, evidence is legally sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[13] In a legal sufficiency review, the reviewing court must consider *all* of the evidence.[14] We have recently emphasized the

---

[10] 43 Tex. Crim. 612, 68 S.W. 180 (1902).

[11] 15 Tex. Ct. App. 23, 24-25 (1883).

[12] For example, the exclusive right of possession could be vested by a temporary court order in a divorce or a partition proceeding.

[13] 443 U.S. 307, 319 (1979) (emphasis in original).

[14] *Id.*; *Brooks v. State*, 323 S.W.3d 893, 916 (Tex. Crim. App. 2010).

need for a "rigorous and proper" application of the *Jackson* standard.[15]

Appellant's position is that the evidence shows that the property on which he was accused of trespassing was the family home, formerly owned by his late mother Roylean. He contends that all of the children—including himself and his sister Claudia, the complainant—now own this land equally and that he had as much right to be on the property as Claudia did. The affidavit of heirship that appellant introduced into evidence was signed by Claudia. It is a form with numerous questions, including the question, "Did the decedent own any real estate in this State." Following this question, the answer "no" is circled. The trial judge concluded that this meant that Roylean did not own the property, and therefore, "there's nothing to be inherited." If this affidavit and Claudia's history of occupying the property were the only evidence relating to the ownership of the property, then I might conclude that the evidence is sufficient. But a review of *all* of the evidence shows otherwise.

At trial, Claudia herself testified without equivocation that all of Roylean's children were record owners of the property:

> [PROSECUTOR]: How did you come to own the residence . . . ?
>
> [CLAUDIA]: My sister had filled out some papers because the city was gonna take the house because of back taxes. And she had the papers filled out, because some – I'm on disability.
>
> * * *
>
> [PROSECUTOR]: So who are the record owners of the residence?
>
> [CLAUDIA]: Delois Frazier, James Frazier, Belinda McBee, Julius Frazier, and Charles Ray Frazier.

---

[15] *Brooks*, 323 S.W.3d at 906 & n.25.

[PROSECUTOR]: Are these all your mother's children?

[CLAUDIA]:. Yes, ma'am.

* * *

[DEFENSE COUNSEL]: And you mentioned that there was multiple owners of the property?

[CLAUDIA]: The family, the whole family.

[DEFENSE COUNSEL]: The family, including Mr. James Frazier?

[CLAUDIA]: Yes, sir.

* * *

[PROSECUTOR]: It is not your contention, Ms. Frazier, and just – can you please explain to the Court that you are not debating that he has a right to the property, am I correct? Okay. You're not saying that he is not one of the people that inherited the house from your mom?

[CLAUDIA]: Well, it's – it's the family house.

[PROSECUTOR]: Right. Right. And so you're not saying that he has no right to be there?

[CLAUDIA]: I'm not saying that he don't – he has all the rights to be there, but he – he has all the rights to be there. They come there for birthdays. They come there for holidays. They come there for any day, just because days. But it's fine. But when James come the police is on their way. Because James want to draw knife, he want to just pick up anything and just erupt everything. It's not only with me.

The police officers who testified at trial did not specifically testify that Claudia had told them that appellant was a co-owner of the property, but their testimony and their conduct that day was consistent with her having so told them. Officer Chien testified that Claudia claimed to be the owner of the house; the officer could not recall specifically if she asked appellant if he was a co-owner.

Sergeant Reginald Franklin testified that he stayed in his vehicle while his subordinates,

Officers Chien and Woodburn, handled the situation at the residence. When the officers came outside, Sergeant Franklin asked what was going on. Sergeant Franklin testified that the officers told him "there was a guy that wouldn't leave." He said that the officers "were trying to I guess figure out if they could make him leave or what the situation was, and they were about to leave." Sergeant Franklin's testimony that the officers were about to leave is consistent with Claudia's testimony that the officers were unwilling to do anything, that they told her that the incident was a civil matter, that they told her that appellant had "just as much right to live in that house as I did," and that one of the officers referred her to their Sergeant when she again pleaded with them to remove appellant from the house.

As the officers were preparing to leave, Claudia approached Sergeant Franklin's vehicle and explained that appellant would not leave and that she was afraid of him. At that point, Sergeant Franklin investigated the matter further. During this investigation, appellant said that the house "was his mother's house" and "that he had a claim to it." Sergeant Franklin told appellant that if Claudia lived there and appellant did not, and Claudia wanted appellant to leave, then appellant was trespassing, regardless of his "monetary or possessionary situation with the house." When asked if he ascertained whether appellant had an ownership interest in the house, Sergeant Franklin responded negatively and said, "That's not our job."

In light of all the testimony, the affidavit of heirship is simply not sufficient evidence to show beyond a reasonable doubt that appellant does not have an ownership interest in the property. The affidavit of heirship makes no statement about who owned the property at the time appellant refused to leave. The affidavit simply states that Roylean did not own any real property at the time of her

death. That statement is not inconsistent with appellant owning an interest in the property. Nor is the affidavit inconsistent with appellant and his siblings obtaining title to the property from Roylean before or at the time of her death. Roylean could have transferred it to them before death, or she could have given them a future interest that would have caused full ownership of the property to vest automatically at death, so that there would be no real property in her estate.[16] So, even if believed, the affidavit is not inconsistent with Claudia's testimony that the home was the family home and all of the children owned it together.

The affidavit is inconsistent with the notion that the children inherited the property. Claudia's testimony is consistent with the property passing to the children by inheritance, but her testimony is also consistent with the property passing to the children by an instrument that conveyed a present or future interest in the property.[17] Appellant's testimony, taken as a whole, is likewise consistent with either scenario.[18] But even if Claudia and appellant had both testified that they

---

[16] *See* TEX. PROP. CODE § 5.041 ("A person may make an inter vivos conveyance of an estate of freehold or inheritance that commences in the future, in the same manner as by a will."); *Terrell v. Graham*, 576 S.W.2d 610, 612 (Tex. 1979) (prior version of current statute "allows estates *in futuro* to be conveyed in derogation of the common law rule which prohibited such conveyances. Under this statute the grantor conveys the title and interest specified in his deed, but full enjoyment and possession is not had by the grantee until the death of the grantor.").

[17] *See* TEX. PROP. CODE § 13.001(b) ("The unrecorded instrument [of a conveyance of real property] is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument.").

[18] Appellant's testimony on redirect suggests that the children obtained the property by some method other than inheritance:

[DEFENSE COUNSEL]: And when did you – this affidavit of heirship, when did you inherit the house? Was that before this incident?

[APPELLANT]: No. My mother did that years ago. . . . She did that back in the 60's

obtained the property through inheritance, the affidavit of heirship is not affirmative evidence that they did not own the property; at best, it negates the idea that inheritance is the method by which the property passed.

Regardless, Claudia's testimony was clear that all of Roylean's children—including appellant—owned the property. A rational jury could not accept her testimony that she had the right to be on the property while ignoring her testimony of where that right came from—ownership acquired from her mother—and who else also had ownership in the property. In fact, the conduct of the police suggests that either she told them that appellant was a co-owner of the property, or that appellant said so and she did not contradict him.

Even the prosecutor did not dispute appellant's ownership interest but argued that he was a trespasser nevertheless: "There's been no debate, and no one is trying to force the defendant off of the property or cheat him out of his ownership interest in the house. However, the possessory interest is lying solely in the – in Ms. Frazier, because the house was left to them all." Later, the prosecutor continued, "At this time it's not Ms. Frazier's contention today, nor is it then, that he could never come to the residence. However, she lives there apparently, and he did not have the right to come there on that day."

That leaves only the question of whether there is evidence that Claudia was granted the right to sole possession of the property by agreement or otherwise, and appellant infringed on that right to sole possession. Despite the prosecutor's suggestion to the contrary in argument, there was no evidence of an agreement or anything else that would confer upon Claudia a right to sole possession

. . . And at that time I reviewed those papers.

of the property.

There was evidence at trial that appellant was a troublemaker and that Claudia had reason to be afraid of him. But as far as the law of criminal trespass is concerned, even a troublemaker has the right to use his own property unless the exclusive right to use that property has been assigned to someone else. I would hold that the evidence is legally insufficient to establish that appellant committed the offense of criminal trespass.

I respectfully dissent.


Filed: April 20, 2011
Do Not Publish